Mr. Birch, you're here by yourself.  The reason we gave you oral argument is because you had a bunch of students with you. Where are they? I hope that's not the only reason, but they are studying for the bar at the moment, Your Honor. They what? Studying for the bar, Your Honor. They didn't know that at the time this argument was scheduled? That's correct, Your Honor. Well, no, they knew they were going to be studying for the bar, but they didn't know they were going to be studying for the bar at the time they took on the case back in the fall of last year. I guess my point is simply this. In the future, if you're going to appear, tell us why. Sure, Your Honor. Because normally this might be the kind of a case that we wouldn't have oral argument, but because you had some students with you, we gave you oral argument. So just know the court is not amused. Sure. Keep that in mind, please. Sure. Well, I'll try not to disappoint, Your Honor, but I do think there are some substantial issues in this case that are worth discussing. That's for you to show us. Sure. So we respectfully ask this court to reverse the agency for two reasons. First— Well, before you get to that, maybe you could explain to me the standard of review in this case. Standard of review. It depends on which issue, Your Honor. So if we're talking about— What's the standard of review for me for this case? I mean, this is a CAT case. Yes. What's my standard of review? Substantial evidence on the likelihood of future torture. Substantial evidence that would what? That would compel this court— Compel the conclusion that the BIA was incorrect, right? That's right, Your Honor. And a reasonable—any reasonable adjudicator would not find as this one did. Yes, Your Honor. So I'm talking about any other judge in America would not find the way this one did. Any other reasonable judge, Your Honor. I understand. That's right. And then after I get through that, it seems to me that my job then is to give that kind of deference, if you will, to the BIA. Isn't that true? I don't— I mean, I can't substitute my opinion about that. That's true. If there's evidence on both sides, I'm going to have to go with them because even though I may not have made the same decision, I'm still going to have to go with them because that's the standard. It doesn't compel anything differently. Isn't that correct? I don't dispute that, Your Honor. Well— I think we satisfied— And you have the burden of proof, right? Yes, Your Honor. Okay. I mean, that's the thing that's most worrisome in, I guess, a CAT case. CAT cases are hard. I don't dispute that. CAT cases are the worst case for your petitioner because the standard of review is so tough. It is. Can we go to a slightly—well, the legal aspect of it? How do you distinguish matter of AAR that was brought out by the government in its 28-J letter? Sure. That's a tough one for you, is it not? Well, I would say a few things about matter of AAR. Number one, it got it wrong. So there was substantial evidence in that case showing that that particular individual would likely be tortured if forced to return— So you're saying matter of AAR is wrong? Yes, Your Honor. Okay. Got it wrong. There is substantial evidence in that case showing that the petitioner in that case would likely be tortured if forced to go back to El Salvador. There was evidence from the country report— But again, but again, Counselor, it seems to me those are great arguments if you're just making the argument to the jury or to the BIA. But you're not. You're making it to us. And we have a deference to the BIA. And so that's why it seems to me that arguing that a case is wrong when we've got to look at it and say they get some deference makes a tough argument. But I think the difference, Your Honor, is there's substantial evidence showing that case is wrong. Well, I understand your idea, I guess, about what substantial evidence. Answer this question. What evidence is there in this record that compels the conclusion—now, we're talking compels the conclusion—that a person who is not involved in an MS-13 or Iberio 18 would be targeted by either the police or the gang members here? There are several things, Your Honor. What? I would start with the country report. The Department of State— Start with what? The Department of State country report. So if you look at that report at the very beginning, it says that one of the significant human rights issues in El Salvador is torture by security forces. That would be thing number one. Thing number two in that report says that prison guards in El Salvador regularly beat detainees. Counsel, you're an experienced lawyer. You know that country reports per se that are very general rarely satisfy situations like this where you have to bring it down to apply to your petitioner. Where have you done that in this case? Well, starting with the country report, and I will say I'll push back on that a little bit. So in Cole v. Holder, for example, this court remanded based on the country report. There the agency disregarded what the country report said, and the country report, for example, said that prison guards regularly beat detainees. And it looked at that report and sent it back to the agency because the agency didn't give it proper weight. So in this case, this is one of the significant things the court always looks to to determine what the likelihood of torture is. The case you cite is very different than this one, is it not? I mean, we get country reports cited to us all the time, and they're way up here, and we don't give any deference to it if there's no way to tie it to the individual petitioner. And I don't see that here. What am I missing? Well, I will say this court has said on a number of occasions that the country report is typically the primary document it looks to for determining country conditions, and it gives it important weights because it's written by experts. But this is just country conditions. It's how they apply to this petitioner. Right. When you have situations that, or the country report specifically refers to a particular police district and violence in that district, and that's what you're talking about, maybe. But when you're talking about, like, for example, we hear all the time, well, in Mexico they've got cartels, and they do violence. That's true. Yes. It's really true. But that's not going to help you going back there to show that because you're here and you have an MS-13 tie that you have some kind of relief. And that's what I'm seeing here. What am I missing? So I'll say two things in response to that, Your Honor. The first is Julio credibly testified that MS-13 members in the California prison system told him that if he goes back to El Salvador, he's going to be viewed as a traitor because of his affiliation with the Mexican mafia and because of his tattoo indicating that affiliation. That was credible testimony that the agency accepted, and that shows the particular risk that he faces if he goes back in addition to the risk that the country reports show. Is that the only evidence we have in the record that shows the police or gang members are aware of the significance of the G-Shield tattoo? Well, we have his testimony, yes, so from his record. I mean, to be fair, I didn't find any evidence in the record other than this supposed idea that it pertained to the G-Shield. The testimony doesn't say that it really relates to the G-Shield. But I didn't find any evidence in this record that the police or gang members are aware of the significance of a G-Shield tattoo at all. Well, in addition to his credible testimony, I would point your honors to the FBI's own reports on California gang tattoos. So it was in the record before – But now, just a minute. California, the FBI reports are not going to be something that's going to be down there. That is true. I don't know if they're going to be in El Salvador or not. But I just pointed that to point out that this is a widely recognized tattoo. And that corroborates Julio's credible testimony that this is a widely recognized tattoo of affiliation with the Mexican mafia. So that shows that this is a credible claim he's making that he's going to face a significant risk if he goes back because of his affiliation with the Mexican mafia. Let me ask you, the evidence we have of the risk he faces of being singled out for torture based on his tattoo is what somebody told him? MS-13 members, your honor, yes. Okay. Let me ask you another question because, I mean, your case is different than any I've seen thus far. You bring up a lot of articles. In fact, several articles that I'm supposed to take as the evidence of country conditions. I've never seen that happen in a case before. Aren't all the articles that you reference, even if they were country condition evidence, aren't they limited to active members of MS-13 or Barrio 18? I mean I went through each one of those articles, and it seems they deal with MS-13 members or Barrio 18 members, not someone who isn't in either group but has a G-shield tattoo. What that shows is, your honor, two things. Number one, those are the two main gangs in El Salvador. Number two, people who are affiliated with the Mexican mafia aren't going back there because it's dangerous, and that's why he fears going back. You didn't answer my question. Aren't all those articles in reference to M-13 or Barrio 18 gangs? Yes, your honor. There's nothing that gets me to G-shield tattoos and how it relates to those at all. That's correct, your honor. Not in this record. There's not. So under the standard of review, doesn't your client lose? No, your honor, he doesn't because he has credible testimony talking about the G-shield tattoo. It is a credible testimony. If there's any evidence on the other side, it's something that compels the result. That's why I took you through the standard of review.  And I do think that testimony compels a different result in this case, but I do want to circle back to one predecessor problem that precedes everything else we've talked about so far, and that is what the agency did in this case. So the agency, when it started its analysis, the first point it made was that a significant and principal reason for denying relief was the fact that he had not been tortured in the past before he left El Salvador. But he left El Salvador at the age of 10. That was over 20 years ago, and he had good reason for leaving at the time. So the agency didn't take that into account, and that's very much like what happened in Akwesong v. Barr. You know, there in that case, the petitioner left her home country. She came and raised a cat claim. The agency denied it by emphasizing that she had not been tortured before she left. This court remanded for reconsideration because she had a reason for not being tortured. She hid to avoid being tortured, just like Julio hid here. He left to avoid being recruited in MS-13 at the time because his uncle was a high-level member of the gang. So he and his mother came to the United States so he could avoid being recruited into it. And that's the exact circumstance we saw in Akwesong, and this court remanded there. We respectfully ask it to do that here as well because that has to be taken out of the equation to determine whether he's likely to be tortured in the future. That discounted all the evidence that came after that, so that has to be taken out. So is it your position then that based on the country report, Flores Vargas has a risk of being tortured because the El Salvadorian officials regularly make arbitrary arrests of young men because of their tattoos alone? Not just arrests, Your Honor, but also beat detainees in prison as well. There's a lot of evidence in the country report showing the conditions that individuals face when they go back to El Salvador. It's not just that they're going to be detained. It's going to be the conditions they're subjected to when they go, not only by prison guards but by other gang members as well. It's so general. The cat relief requires you to show there's a greater than 50 percent chance of torture. And what you've done here is talk about the general conditions, how awful it is, and so on, but you don't tie it to your petitioner, and you certainly don't try to show that you meet the 50 percent or greater standard, do you? I think we do, Your Honor, with his testimony about the danger he faces as being a member of the Mexican mafia going back to a country full of Salvadoran gang members. That's the risk he faces that's unique to him. But still, first in review. Let me ask you this. Somewhere in your briefing you talk about the significant risk of torture, and it translates to 60 percent of the country's 118,000 gang members. Yes, Your Honor. Is that what you're talking about as far as exceeding the 50 percent? No, Your Honor. That just shows he's likely to be detained. So if they detain more than half of the gang members, that shows that he's likely to be detained as well. Do you want to save any of your time? I do. It's probably up to you. I do. I want to save the rest for rebuttal, if that's okay. Very well. Thank you. All right. Let's hear from the government. Ms. Stout. Thank you, Your Honor. Good morning, Presiding Judge Smith. May it please the Court. My name is Abigail Stout, and I represent the respondent in this case. As this Court has already noted, the issue in this case is straightforward and carries a deferential standard of review. Whether the immigration judge and the Board of Immigration Appeals erred by finding that Petitioner failed to carry his burn to prove that he was entitled to cap protection. This would require the Petitioner to fail to prove that it was more likely than not that he would be tortured if returned to El Salvador, his home country. The immigration judge and the Board of Immigration Appeals found that it was not. And administrative findings of fact, as noted, are conclusive on a reviewing court unless any reasonable adjudicator would be compelled to conclude to the  Let me ask you this, Counsel. You, in your 28-J letter, referred to the matter of AAR. What gravitas does the government ascribe to that case? You heard your opponent say that it was wrong. What difference does that make? But please, in what manner does the matter of AAR enter into our consideration? Your Honor, we would suggest that AAR was correctly decided and, in fact, embodies a lot of the principles that are already found in Ninth Circuit precedent across the board. First, AAR recognizes that general grievances or generalized complaints are not sufficient for the particularized CAT standard. Secondly, it talks about specifically the prison conditions, which echoes a lot of the Ninth Circuit precedent, but talks about prison conditions in and of themselves not amounting to torture and even dire prison conditions not amounting to torture. Well, about that, let me ask you this question. I think the country report indicates that President Buchanan doesn't give his government acquiescence to what happens in the prisons. I mean, he understands what's happening, and I think he indicates that that's what he intends. My question is, if we follow the reasoning in the matter of AAR and hold that the approval of gang members' treatment in prison is not acquiescence, then what would the President have to do for there to be a finding of government acquiescence? Your Honor, I think there's a few things in your question, and I think the most significant part is what is required for torture, and then we can analyze then what's required for acquiescence. And I think what AAR points out and Ninth Circuit precedent points out is that there needs to be intent for there to be torture. So there needs to be an intent of mistreatment or intent to torture. Well, they indicate that he agrees with what's happening and indicates that they are being treated the way we say they are, that it's being said they are. Your Honor, I think as AAR explains, there are certain prison conditions, perhaps like beatings that my friend on the other side brought up, that Ninth Circuit precedent has not held in and of itself amount to torture, kind of as an initial matter. And then secondly, President Bukele's awareness of prison conditions, I think there's a few ways we could analyze or look at that. First is awareness of prison conditions. Our assertion is that those current prison conditions, as explained in AAR, do not amount to torture. And also any kind of statement from the El Salvadoran government, as AAR analyzes and some points out, goes to perhaps the kind of reflection on the moral character of gang members and the way that the government wants to crack down on the spread of gang members and the violence that it's created in the society. Well, my question to this, he's acknowledged that it's happening and he's aware of it and suggests that he even approves of it. My question is what would he have to do for there to be a finding of acquiescence if that's not acquiescence? In order for Petitioner here to receive cap protection under that acquiescent standard, the Petitioner would have to show that the government itself would be aware of but then acquiesce to or not decline to intervene in the particular torture that's going on. So there would have to be the finding of torture first and then the finding of So you're saying there's no torture? Your Honor, that is our submission. As the matter of AAR states, the prison conditions in El Salvador currently do not amount to that and that's also what this court in the Parks case addressed as well. It addressed also and analyzed the 2022 report and found that the prison conditions there, though harsh, though dire, did not amount to torture there because there wasn't that intent element as both the Ninth Circuit and then the Board of Immigration Appeals found. Well, how do you prove intent more than when you have the President saying, I'm aware of this and this is what I expect to happen in my prisons? Your Honor, I think that intent, there's the issue of the high-ranking public official and whether that would be the particular acquiescence that would be No, this is the President saying this. So what more do you need? I think for Petitioner to receive cap protection, the Petitioner would have to show that there was specific acquiescence in his case by a public official. So if he was undergoing torture himself, that either the President through policy set that amounted to torture would be permitting that or if a specific public official would be acquiescing to the particular torture he was undergoing. But he hasn't lived there since he was 10. How is he going to prove that it would apply to him specifically? I think that goes to also that it's the Petitioner's burden to prove acquiescence also. And in this record that we have before us, other than a kind of fleeting reference in the record on page, in the record on AR 183, where Petitioner has stated that when talking about gangs, quote-unquote, running the prison, that he knows that just because that's how it is and because they live there. That's the only evidence that we have that Petitioner in this case would show on the acquiescence point. Well, if there's no evidence of past torture and no threats, how do you determine if a particular risk in this case exists? Your Honor, the Petitioner has the burden to prove each element. How would he prove that in this case? Here in this case he would have to prove that it is more likely than not that each element in the chain of hypothetical events that he asserts would be more likely than not to happen. So here he asserts that his criminal history and his tattoos would make him a target for detention, that he would then be detained, and that while in detention he would be tortured. So each one of those links in the chain would have to be proved more likely than not. Here, when the immigration judge and the Board of Immigration Appeals looked at that, they found that each chain was not more likely than not, and so he does not receive cat protection. And that's very like a matter of JFF, where the court looked at the hypothetical links in the chain to determine whether that Petitioner received cat protection and said that it was too speculative, Petitioner did not prove each link in the chain, and therefore that Petitioner did not receive cat protection. So the same here. There's a pending appeal of the denial of the motion to reopen, and pursuant to 8 U.S.C. sections 1252b6, it provides that when judicial review of the final order of removal is filed, that review shall be consolidated with the motion to reopen. Do you have any objection to us proceeding with this case with that appeal pending? Your Honor, that is also our understanding of the statute, that it would require consolidation of these cases. As you know, in your footnote, you mentioned that Riley v. Bondi is pending. What do we do with that? Your Honor, Ninth Circuit precedent is currently clear that this is considered a final order of removal that is reviewable by this court, and this court has jurisdiction to remove it. The government has been including that footnote in many of its briefs just to make the court aware that that case is pending. As a practical matter, both sides in that case at the Supreme Court stage are in agreement that this would be a final order that the courts of appeals have jurisdiction to hear, and the Supreme Court has, in fact, appointed Fourth Circuit amicus to defend that decision. So do we wait or don't wait for Riley? We would urge the court not to have to wait for Riley because Ninth Circuit precedent is currently clear on that issue and would decide the case. I gather, though, that the government's primary position is the one that my colleague mentioned at the very beginning, and that's the substantial evidence rule. Is that correct? Yes, Your Honor. How would the resolution of this matter impact the appeal of the denial of a motion to reopen? Currently there is no stay motion pending. My understanding is there is no stay motion pending in that second case. There has been a PFR file in that case, as Your Honor has mentioned. The case number there is 25-3301. So, theoretically, without a stay motion pending, resolution of this case could determine removal of petitioner. I have no questions. Judge Reyes asked all my questions about the motion to reopen. I don't have any more there, and you asked my question about the case that they highlighted in the footnote. Those were going to be my questions, so I have no further questions. Any questions? I have no further questions. Anything you'd like to say? No. We would just emphasize the standard of review here. Again, reiterate that Petitioner is offered no specific evidence other than generalized claims and nothing particular to his case, which is required under the cat removal, and that because record evidence does not compel the conclusion that Petitioner demonstrates it's more likely than not that he'll be tortured in El Salvador, this Court should affirm that. Well, the country report, you're basically arguing we should ignore that. Is that right? Your Honor, we're not arguing that you should ignore it. I think that, as Judge Smith pointed out earlier, the country report is very generalized. Here, the immigration judge very clearly did consider the country report, and in its analysis on balance said that Petitioner did not carry his weight to prove a particularized, you know, threat of torture for himself. So the country report is not dispositive in this case. Thank you. Very well. Thank you. All right. Mr. Persh, you have some rebuttal time. Thank you, Your Honors. It may please the Court. I just want to make a few quick points, and I want to start with substantial evidence, the standard. There have been a lot of questions about that today. And I just want to emphasize that that was the standard in Akwesasne v. Barr as well. And in that case, this Court remained it for reconsideration because the agency didn't take into account the fact that the individual in that case had fled to avoid torture, and that's why she wasn't tortured in the past. Well, let me ask you this. In this case, how do we determine if a particularized risk of Flores-Vargas, if there is no evidence of past torture and no threats? There's particularized evidence or risk of torture in this case because of his affiliation with the Mexican Mafia, and that's the key thing that makes this case different than most others. He's a member or former member of the Mexican Mafia being sent back to a country full of Salvadoran gang members. And he credibly testified that MS-13 members told him in prison that if he goes back, he's going to be viewed as a traitor and he's going to die because of it. So that's the thing that places him at particular risk in El Salvador is that affiliation with the Mexican Mafia, and if he goes back, that's the risk he faces. You know, I think just in the sitting we've had this week, we've had, I think, three cases. They're almost identical to this. Same claim. There are a lot of gang members raising cat claims. I don't dispute that. But, again, he is a former member of the Mexican Mafia being sent back to El Salvador where he's going to be treated differently. He's not a member of MS-13. He's not a member of the 18th Street Gang. He's going to be viewed as a traitor like he testified. By whom? By the Mexican Mafia? They're not in El Salvador. By his country members, Your Honor. By MS-13, by 18th Street Gang, by security officials. But your client is claiming that if he goes to El Salvador, he's going to be tortured there. Yes. Based upon his traitorous activities to Mexican gangs in which he affiliated in the United States. Yes. That's quite different than saying he was a member of an El Salvadorian gang that he betrayed, right? It is a credible risk, Your Honor, that he faces if he goes back. They're going to view him as a traitor because he affiliated with a gang that's not associated with his country. That's how gang mindsets work. They view him as a traitor because he wasn't a member of MS-13. He wasn't a member of 18th Street. And when he goes back, they're going to say you were a member of the Mexican Mafia. And he's likely to die because of that. Can you believe that that evidence is sufficient to undermine the substantial evidence that was presented to the IJ and the BIA? I believe when you combine that with the country report and the other evidence in the record, yes, Your Honor, there it is. And, again, before you even get to any of that, you have to start with what the agency did in this case. It discounted his likelihood of being tortured in the future by finding that he had not been tortured in the past. That's exactly what happened in Acosong. So you have to take that out of the picture and then view his claim through the lens of current country conditions, and that didn't happen here. Your time is up. Thank you, Your Honor. Thanks to both counsel for your argument in this case. The case of Flores-Vargas v. Bondi is submitted.
judges: SMITH, SMITH, Rayes